Filed 12/24/25

| | | |
|---|---|---|
| VERMONT SUPERIOR COURT<br>Chittenden Unit<br>175 Main Street<br>Burlington VT 05401<br>802-863-3467<br>www.vermontjudiciary.org |  | CIVIL DIVISION<br>Case No. 25-CV-2724 |

| | |
|---|---|
| Christopher Armstrong,<br>        Plaintiff<br><br>        v.<br><br>The Lane Press, Inc., Philip Drumheller, and William "Terry" Dorman d/b/a/ Dorman & Fawcett,<br>        Defendants | DECISION ON MOTION |

## RULING ON MOTION TO DISMISS

In this employment action, Plaintiff Christopher Armstrong filed a complaint alleging breach of contract, wrongful termination, and related claims against The Lane Press, Inc. ("Lane Press"), Philip Drumheller, and William Dorman, d/b/a Dorman & Fawcett ("D&F"). Lane Press and Drumheller have filed their answers, but D&F filed a motion to dismiss all claims asserted against it pursuant to Rule 12(b)(6) of the Vermont Rules of Civil Procedure, essentially asserting that Lane Press, not D&F, was Armstrong's employer. Armstrong responds that D&F and Lane Press were his joint employers, D&F made decisions for Lane Press, and D&F was partially responsible for his termination. Plaintiff is represented by Adam W. Waite, Esq. and Zachary D. Hozid, Esq. and Defendant D&F is represented by Cristina L. Dulay, Esq. For the reasons discussed below, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

## Factual Background

For purposes of deciding the instant motion, the Court accepts the following facts alleged in Plaintiff's Complaint as true. The Court makes no finding as to their accuracy.[1]

Plaintiff Armstrong was hired as Lane Press's Executive Vice President in May 2023. He entered into an employment agreement ("the Agreement") with Lane Press that outlined the terms of his employment. The Agreement, which is attached as an exhibit to the Complaint, specified that Armstrong "shall report directly to the Company's Chief Executive Officer and Dorman & Fawcett." Ex. 1, ¶ 1.1. Armstrong negotiated the Agreement with both Mr.

---

[1] *See Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 10, 209 Vt. 514 ("On a motion to dismiss, the court must assume that the facts pleaded in the complaint are true and make all reasonable inferences in the plaintiff's favor.").

Drumheller and Mr. Dorman, his employment was supervised and directed by Lane Press and D&F at all times, and he received direct orders from both Lane Press and D&F throughout his employment. Compl. ¶¶ 11-15. Armstrong's bonus for the 2023-2024 fiscal year was negotiated with both Drumheller and Dorman. *Id*. ¶ 25. Armstrong asserts, on information and belief, that D&F assumed a part ownership or partnership relationship with Lane Press and that D&F made decisions for Lane Press. *Id*. ¶¶ 18-19. D&F supervised Lane Press's employees, including Armstrong. *Id*. ¶ 22.

Beginning around November 2024, Armstrong began questioning D&F's financial management of Lane Press. As Armstrong sought more information, D&F refused to provide answers. Armstrong hired a controller, and Dorman responded by insisting that D&F be involved in all the controller's decisions and that the controller report directly to D&F. *Id*. ¶¶ 26-28. In January 2025, Armstrong raised concerns to Drumheller and Dorman about the way in which Lane Press was treating a customer that had placed a large order. Lane Press intentionally slowed shipments of completed materials to the customer, despite knowing that the materials were time-sensitive, to incentivize the customer to pay its invoices before they were due. Armstrong believed this tactic was bad business and unethical. At the end of January 2025, Dorman directed Lane Press employees to invoice the customer for all completed work but to hold the shipments. Armstrong continued to question this way of doing business, and on March 14, 2025, he was terminated with no prior warning or notice. *Id*. ¶¶ 32-38.

Armstrong asserted claims against D&F/Dorman for unpaid wages in violation of Title 21, breach of contract, wrongful termination, tortious interference with contract, civil conspiracy, and aider and abettor liability. The Court addresses the claims in turn below.

Discussion

"The purpose of a motion to dismiss is to test the law of the claim, not the facts which support it." *Powers v. Off. of Child Support*, 173 Vt. 390, 395, 795 A.2d 1259, 1263 (2002) (citation omitted). When considering a Rule 12(b)(6) motion, courts "assume as true the nonmoving party's factual allegations and accept all reasonable inferences that may be drawn from those facts." *Wool v. Off. of Prof'l Regulation*, 2020 VT 44, ¶ 8, 212 Vt. 305 (quotation omitted). Further, the court assumes "that all contravening assertions in [the nonmoving party's] pleadings are false." *Mahoney v. Tara*, LLC, 2011 VT 3, ¶ 7, 189 Vt. 557 (quotation omitted). Motions to dismiss for failure to state a claim are "disfavored and should be rarely granted." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575. Dismissal is improper "unless it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." *Wool*, 2020 VT 44, ¶ 8 (quotation omitted). However, as our Supreme Court has held, "where the plaintiff does not allege a legally cognizable claim, dismissal is appropriate." *Montague*, 2019 VT 16, ¶ 11 (citation omitted).

I.      Unpaid Wages (Counts I and III).

Armstrong alleges that he is owed wages for his accrued paid time off ("PTO") (Count I) and as severance (Count III). Both of these claims are based on the Agreement, which specifies that (1) he is entitled to six weeks per year of PTO that accrues at the beginning of the calendar year, Ex. 1, ¶ 2.2(c), and (2) if Armstrong is terminated without cause or for good reason during

the first three years of employment, he is to be paid severance, which is his base salary for 90 days, *id*. ¶ 3.2(b), in addition to his accrued but unused PTO, *id*. ¶ 3.2(c).[2]

D&F contends it is not liable for these claims because Lane Press was Armstrong's employer, not D&F. Mot. to Dismiss at 2-3; Reply at 2-5. The Agreement is signed by Armstrong and Drumheller, on behalf of Lane Press, but it provides that Armstrong is to report "directly" to D&F in addition to Lane Press's CEO. Ex. 1, ¶ 1.1. Armstrong states that D&F was a joint employer along with Lane Press and had substantial supervision and influence over him. Specifically, Armstrong alleges that he negotiated the Agreement with Drumheller and Dorman, his employment was directed and facilitated by both Lane Press and D&F, he was supervised by both Drumheller and Dorman and received direct orders from both throughout his employment, and he negotiated his bonus with both men. In addition, he alleges that D&F "assumed a part ownership or partnership relationship with Lane Press," made decisions for Lane Press, facilitated meetings that Armstrong attended, and was influential in and made most of the financial decisions for Lane Press, including those related to payments, cash flow, businesses with which Lane Press worked, and product orders. Thus, Armstrong argues he has sufficiently alleged that D&F is liable for unpaid wages as his joint employer with Lane Press.

Under the "joint employer doctrine," a joint employer relationship may exist when two or more entities "share significant control of the same employee." *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022) (citations omitted). "Because the exercise of control is the guiding indicator, factors indicating a joint-employment relationship may vary depending on the case, and any relevant factor may be considered so long as it is drawn from" agency common law principles. *Id*. at 844 (quotation omitted). Relevant factors include the putative joint employer's right to assign particular projects to the employee, the right to fire him or her, and the extent of control over the employee's work activities. *Id*. at 843; *see also Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)). "'[W]here control over the various elements of employment is shared among multiple entities, the concepts of 'joint employer' and 'single employer' help determine who actually employs' the employees in question." *In re Welch*, 2020 VT 72, ¶ 23, 213 Vt. 92 (quoting *In re Election Petitions*, 2016 VT 7, ¶¶ 26, 35, 201 Vt. 123). Determining the employer of a particular employee is a fact-intensive inquiry that can only be done on a case-by-case basis. *In re Election Petitions*, 2016 VT 7, ¶ 26.

While D&F focuses heavily on the Agreement, Armstrong's claims for wages, double damages, and an award of his attorney's fees are asserted under Title 21 of the Vermont Statutes. *See* Compl. ¶¶ 40, 41, 49, 50. "Wages" is defined as "all remuneration payable for services rendered by an employee, including salary, commissions, and incentive pay." 21 V.S.A. § 341(5). In addition, similar to Title VII, under Vermont law, "employer" is defined as "any

---

[2] The Agreement, which was attached to the Complaint, merges into the Complaint and is properly considered in ruling on the motion to dismiss. *Kaplan v. Morgan Stanley & Co*., 2009 VT 78, ¶ 10 n.4, 186 Vt. 605 (mem.); *see also United States v. EZ Lynk, SEZC*, 149 F.4th 190, 198 (2d Cir. 2025) ("Documents explicitly referenced in a complaint are considered part of the complaint and may also be considered for purposes of the motion to dismiss." (citation omitted)).

person that employs one or more individuals," and "employee" as "an individual who has entered into the employment of an employer, where the employer is unable to show that the individual has been and will continue to be free from control or direction over the performance of the services, both under the contract of service and in fact." *Id*. §§ 341(2), 341(1)(A); *see Felder*, 27 F.4th at 842-43 (discussing definitions of "employer" and "employee," and application of joint-employer doctrine under Title VII); *Frederick v. Unilever U.S., Inc.*, No. 280-3-20 Cncv (Vt. Super. Ct. Sept. 7. 2022) (Hoar, J.) (discussing joint employer doctrine in connection with FEPA claim).

Here, the Court concludes that Armstrong has alleged sufficient facts relating to D&F's supervision of and control over his employment, as detailed above, to state a claim that D&F was his joint employer and therefore may be liable to him for any wages that remain unpaid under Title 21, Subchapter 2. *See, e.g.*, *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 37 (E.D.N.Y. 2015) (holding that joint employers are jointly and severally liable for plaintiff's unpaid wages under Fair Labor Standards Act and New York labor law); *see also Felder*, 27 F.4th at 845 (noting that, '[a]t the motion to dismiss stage, a plaintiff's burden to answer this question [relating to joint employment] is not great"). Accordingly, D&F's motion to dismiss Counts I and III is denied.

## II. Breach of Contract (Count II).

Count II of Armstrong's Complaint asserts a breach of contract claim against both Lane Press and D&F. While there is no question that the Agreement was signed only by Armstrong and Lane Press, Armstrong alleges, on information and belief, that D&F assumed a part ownership or partnership relationship with Lane Press. Compl. ¶ 18. While D&F quarrels with this factual assertion, if Armstrong can establish that D&F (or Dorman) was a partner of Lane Press during the relevant period of time, D&F (or Dorman) may be liable for any breach of the Agreement proven by Armstrong. *See* 11 V.S.A. § 3226(a) ("all partners are liable jointly and severally for all obligations of the partnership"). Therefore, the motion to dismiss Count II must be denied.

## III. Wrongful Termination (Count IV).

In Count IV, Armstrong asserts he was wrongfully terminated by Lane Press and D&F in violation of public policy. He contends he was terminated because he questioned D&F's financial management of Lane Press and raised concerns about what he considered to be unethical business practices and D&F's conflicts of interests. Compl. ¶ 80. The reason Lane Press and D&F gave for his termination was that he "defied a direct instruction issued by Philip Drumheller and Terry Dorman regarding a client account" and that he provided false information when asked about the matter. *Id*. ¶ 78. Armstrong alleges that this stated basis for his termination is false. *Id*. ¶ 79.

In Vermont, an at-will employee may be discharged at any time with or without cause, "unless there is a *clear and compelling* public policy against the reason advanced for the discharge." *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 82, 807 A.2d 390, 397 (2002) (quoting *Jones v. Keogh*, 137 Vt. 562, 564, 409 A.2d 581, 582 (1979)); *see also LoPresti v. Rutland Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 21, 177 Vt. 316 ("Our law specifically

recognizes public policy limits on employer discretion in at-will situations."). The public policy exception to at-will employment contracts need not be legislatively defined. *Payne v. Rozendaal*, 147 Vt. 488, 491, 520 A.2d 586, 588 (1986). Rather, public policy

> may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. . . . When a course of conduct is cruel or shocking to the average [person's] conception of justice, such course of conduct must be held to be obviously contrary to public policy . . . .

*Id*. at 492, 520 A.2d at 588 (quotation omitted).

In *Jones v. Keogh*, the Vermont Supreme Court found that terminating an employee for the following reasons may violate public policy: serving on a jury, filing a claim for workers' compensation, and refusing to give perjured testimony. *Jones*, 137 Vt. at 564, 409 A.2d at 582. In *Payne*, the Court found firing someone "solely on the basis of age contravenes a clear and compelling public policy" even before Vermont enacted a law expressly forbidding age discrimination. *Payne*, 147 Vt. at 491, 520 A.2d at 588. On the other hand, the *Jones* Court affirmed the lower court's Rule 12(b)(6) dismissal of an employee's claim that firing her in retaliation for asserting her rights to vacation and sick time was a violation of public policy. *Jones*, 137 Vt. at 563, 409 A.2d at 582; *see also Dulude*, 174 Vt. at 81-82, 807 A.2d 390, 396-97 (affirming dismissal of employee's claim that her termination violated public policy where employee questioned employer's practices regarding proper narcotic administration and refused to comply with employer's policy). Subsequently, the Supreme Court "held that employers were entitled to judgment as a matter of law on claims alleging that the employer violated public policy (1) by firing an employee for refusing to sign a potentially unenforceable noncompetition agreement, and (2) by firing an employee for administering medication in a manner that the employee thought was proper but that violated the employer's policy." *Adams v. Green Mountain R.R. Co*., 2004 VT 75, ¶ 5, 177 Vt. 521 (citing *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 313-14, 683 A.2d 386, 391 (1996) and *Dulude*, 174 Vt. at 82, 807 A.2d at 397). Thus, our Vermont Supreme Court has "been reluctant to reprimand employers for terminating employees who exercised merely private rights." *Marcoux-Norton v. Kmart Corp.*, 907 F. Supp. 766, 771 (D. Vt. 1993).

The Court finds that Armstrong's conduct is more akin to that alleged in *Jones* and *Dulude* than the age discrimination claims in *Payne*. While Armstrong asserts that he was discharged for raising concerns regarding what he believed to be "unethical business practices," he does not cite to any specific state law or professional ethical code that he was being forced to violate. *Cf. LoPresti*, 2004 VT 105, ¶ 20 (plaintiff's claim that he was fired for refusing "to potentially violate state law and his professional ethical code" by referring patients to doctors providing substandard care had sufficient "connection to the protection of health care consumers" to implicate a public policy concern). Rather, Armstrong's conflict with Lane Press and D&F stemmed from his "professional disagreements" with his employer, rather than any public policy consideration. *Dulude*, 174 Vt. at 82, 807 A.2d at 397 (holding that, as a matter of law, plaintiff's "professional disagreements are insufficient to support a public policy claim"); *see also Jones*, 137 Vt. at 564, 409 A.2d at 582 ("While full employment and employer-employee harmony are noble goals to which society aspires, they alone do not present the clear

5

and compelling public policies upon which courts have been willing to rely in upholding an action for discharge of an employee at will."). Thus, Armstrong has failed to state a claim for wrongful termination in violation of public policy, and D&F's motion to dismiss Count IV is granted.

   IV. <u>Tortious Interference with Contractual Relations (Count V).</u>

   In Count V, Armstrong claims D&F (or Dorman) tortiously interfered with his employment relationship with Lane Press, causing Lane Press to terminate him in a manner that violated the Agreement. Compl. ¶¶ 89-90. In his Opposition, Armstrong clarifies that this count is asserted as an alternative theory to the wrongful termination and breach of contract claims in the event that D&F is found not to be a joint employer or party to the Agreement. Opp. at 8. "A party may . . . state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, or on equitable grounds, or on both." V.R.C.P. 8(e)(2); *see Gallipo v. City of Rutland*, 173 Vt. 223, 228-29, 789 A.2d 942, 947 (2001) (noting that Vermont's rules of civil procedure allow plaintiffs to assert inconsistent claims).

   In Vermont, "one who intentionally intrudes to disrupt an existing contract relation may be liable in tort." *Kneebinding, Inc. v. Howell*, 2018 VT 101, ¶ 93, 208 Vt. 578 (quotation omitted). The tort is more fully explained as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id*. (quotation omitted). To state a claim, a plaintiff must plead the following:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference on the part of the interferer; (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained.

*Skaskiw v. Vt. Agency of Agric.*, 2014 VT 133, ¶ 24, 198 Vt. 187 (quotation omitted). To be found liable, "the defendant must have intentionally and improperly induced or caused [another] not to perform under its contract with the plaintiff," who "must have suffered harm from the interference." *Kneebinding*, 2018 VT 101, ¶ 93 (quotation and citation omitted).

   Here, Armstrong's Complaint adequately states a claim for tortious interference by D&F/Dorman. He pleads the existence of an employment agreement, knowledge by D&F of the employment relationship, D&F's resistance to answering his questions about D&F's/Lane Press's alleged financial improprieties and unethical business practices, and D&F's directing its staff to get involved with and monitor everything his recently hired controller did. Compl. ¶¶ 26-28, 80-82. He further alleges D&F/Dorman caused him to be fired without following the termination procedures detailed in the Agreement immediately after he questioned D&F's

decision to invoice a customer without shipping the time-sensitive order out until payment was received. *Id*. ¶¶ 35-38. While Armstrong asserts that the stated reason for his termination (insubordination) was pretextual, discharge on the proffered grounds supports his argument that D&F interfered with his employment with Lane Press by causing him to be terminated after he challenged D&F's business decision.

D&F argues there is no claim for tortious interference with contract because Armstrong describes D&F as an agent of Lane Press rather than as a third party, and under *Skaskiw*, an employer's agent cannot be liable for this type of tort. Mot. to Dismiss at 4-5. *Skaskiw* involved a claim of tortious interference against individuals who were employed by the Department of Children and Families, and the plaintiff asserted that the employees interfered with her economic relationship with the department. *Skaskiw*, 2014 VT 133, ¶ 23, 198 Vt 187. In dismissing the claim, the Court explained that an agent acting within the scope of their authority cannot be liable for interfering with a plaintiff's economic relationship with the agent's principal. *Id*. ¶¶ 24-25. This is because there must be "three distinct parties – a plaintiff, a defendant, and a third party with whom the plaintiff wishes to deal." *Id*. ¶ 24 (citing *Stone v. Town of Irasburg*, 2014 VT 43, ¶ 66, 196 Vt. 356; *Restatement (Second) of Torts* § 766 (1979)).

Leaving aside Armstrong's joint employer theory, Armstrong asserts that D&F had an agreement in place to help Lane Press with its financial difficulties. Compl. ¶ 6. Under this theory, D&F could be found to be an independent contractor or other entity separate and independent from Lane Press. The Agreement's requirement that Armstrong report directly to D&F as well as to Lane Press's CEO does not affect D&F's alleged status as an independent actor and third party, rather than an agent of Lane Press. Again, while D&F suggests the facts are otherwise, this must await development in discovery and determination at a later stage of the case. D&F's motion to dismiss Count V is denied.

V. Civil Conspiracy (Count VI).

Next, Armstrong asserts that Defendants engaged in a civil conspiracy "to unlawfully terminate Plaintiff's employment and withhold wages from him" by alleging that he had engaged in conduct that was harmful to Lane Press and that they had "a meeting of the minds to do so." Compl. ¶¶ 93-94. Employers have a statutory duty to pay wages within a particular time frame, and failure to do so may result in fines, double damages, and an award of attorneys' fees. 21 V.S.A. §§ 342, 345, 347.

In 2003 a three-justice panel of our Supreme Court questioned whether an independent cause of action for the tort of civil conspiracy still exists. *See Davis v. Vile*, No. 2002-465, 2003 WL 25746021, at *3 (Vt. Mar. 2003) (unpub. mem.) ("[a]ssuming that there continues to be an independent cause of action for the tort of civil conspiracy," and citing cases from other states holding that civil conspiracy is not actionable in and of itself). Twenty years later, a different three-justice panel again raised the question, noting that to "make out a claim for conspiracy, a plaintiff must allege the existence of 'a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means.'" *Manheimer v. Our Court Tennis Club*, No. 23-AP-092, 2023 WL 5341142, at *5 (Vt. Aug. 2023) (unpub. mem.) (quoting *Boutwell v. Marr*, 71 Vt. 1, 6, 42 A. 607, 609 (1899)); s*ee also Montgomery v. Devoid*, 2006 VT 127, ¶ 10, 181 Vt. 154 (lower court considered but ultimately

rejected plaintiff's civil conspiracy claim because defendants' alleged decision to act in concert did not occur until after unlawful conversion took place). Further, the *Manheimer* panel clarified that "[i]n a civil action, even if there is an illegal purpose, there can be no recovery unless illegal means were employed." *Manheinmer*, 2023 WL 5341142, at *5 (quotation omitted); *accord Davis*, 2003 WL 25746021, at *3 (affirming dismissal of civil conspiracy claim where plaintiff "failed to allege facts that satisfy the 'illegal means' element").

In support of this claim, Armstrong asserts that Defendants collaborated to terminate his employment unlawfully and withhold his wages. Compl. ¶ 93. Specifically, he alleges Defendants jointly charged him with causing reputational harm to Lane Press and that they did this to avoid providing him with written notice and an opportunity to cure before terminating his employment. He also alleges that Defendants communicated with each other and agreed not to pay him any bonus or for his unused PTO, which was a knowing violation of the Agreement. *Id*. ¶¶ 94-98.

Neither party has cited any Vermont cases in which a plaintiff has prevailed on a civil conspiracy claim, and the Court is aware of none. However, violating Vermont's labor laws is illegal, and if Armstrong establishes that Defendants conspired to terminate his employment and committed such a violation or other "illegal means" in doing so, he may be able to prevail on this claim. Accordingly, the Court must deny D&F's motion to dismiss the claim at this early stage of the litigation. *See Montague*, 2019 VT 16, ¶ 11 ("We are particularly wary of dismissing novel claims because the legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." (quotation omitted)).

VI.     Aider and Abettor Liability (Count VII).

Armstrong asserts his claim for aider and abettor liability only against Dorman "as an alternative theory of liability if he is not held to be a joint employer." Opp. at 13. If Dorman is not held directly liable for terminating Armstrong's employment and failing to pay him the wages which he is allegedly owed, Armstrong relies on this theory of liability to hold Dorman accountable for aiding and abetting Lane Press/Drumheller's wrongs committed against him.

According to the Restatement (Third) of Torts,

A defendant is subject to liability for aiding and abetting a tort upon proof of the following elements:

(a) a tort was committed against the plaintiff by another party;
(b) the defendant knew that the other party's conduct was wrongful;
(c) the defendant knowingly and substantially assisted in the commission or concealment of the tort; and
(d) the plaintiff suffered economic loss as a result.

*Restatement (Third) of Torts: Liab. For Econ. Harm* § 28 (2020). Vermont has recognized aiding and abetting liability in the civil context. As the Supreme Court observed: "[W]e have held that '[a]ll who aid in the commission of a tort by another, or who approve of it after it is

8

done, if done for their benefit, are liable in the same manner as they would be if they had done it with their own hands.'" *Montgomery*, 2006 VT 127, ¶ 22 (emphasis omitted) (quoting *Dansro v. Scribner*, 108 Vt. 408, 411, 187 A. 803, 804 (1936)); *see also Ahmad v. N.Y. City Health & Hosps. Corp.*, No. 20 Civ. 675 (PAE), 2021 WL 1225875, at *15 (S.D.N.Y. Mar. 31, 2021) ("[W]here an employer is found liable for discrimination, an individual can be held liable for aiding and abetting allegedly unlawful discrimination by the employer, even where the individual's actions serve as the predicate for the employer's liability.").

Dorman argues that the only tort he is alleged to have aided and abetted is Armstrong's claim for wrongful termination because the other substantive causes of action include breach of contract and statutory violations. Mot. to Dismiss at 6-7. The Court agrees. Armstrong provides no authority for extending aider and abettor liability to statutory violations or breach of contract actions. Accordingly, given the Court's conclusion that Armstrong has failed to state a claim for the tort of wrongful termination in violation of public policy, the motion to dismiss Count VII is granted.

<u>Order</u>

For the foregoing reasons, Defendant D&F's Motion to Dismiss (Mot. #3) is DENIED as to Counts I-III, V, and VI and GRANTED as to Counts IV and VII.

Defendant D&F shall file an Answer within 14 days and the parties shall file a proposed discovery schedule within 14 days thereafter.

Electronically signed on December 24, 2025 at 1:49 PM pursuant to V.R.E.F. 9(d).

_____
Megan J. Shafritz
Superior Court Judge

9